Good morning. May it please the Court, my name is Warren Campbell and I represent Hair Replacement Centers, Inc., which is referred to throughout our papers and was commonly known as HRC. This matter originated in the Orange County Superior Court by a lawsuit filed by Mr. Bruce Baker in 1993. Hair Replacement Centers, or HRCs, settled all of Baker's claims asserted against HRC after Dow Corning filed bankruptcy. And HRC continued with its cross-complaint until it was the state couldn't be lifted, and then filed a claim in the bankruptcy court against Dow for equitable indemnity. Your Honor, the lawsuit that was filed by Baker against HRC alleged various causes of action. The main causes of action were negligence against HRC and strict liability. HRC filed a motion for summary judgment saying that it couldn't be held strictly liable. It was hotly contested by Baker. The matter was continued by the court twice, and when we appeared to argue it, the court determined that it was premature because Dow was now being sued and brought in as the manufacturer. The pleadings that Baker filed alleged that Dow so-and-so was the manufacturer, and then later identified as Dow, and that HRC was the retailer of the product. Discovery began, and it was a hotly contested matter. The first amended complaint was filed by Baker. HRC filed this first amended complaint included all of the causes of action, but added a cause of action for fraud. HRC filed a demur, and it was sustained as to the fraud cause of action. Baker filed a second amended complaint, and HRC again filed a demur and a motion for summary adjudication again, which included a request for adjudication of the strict liability cause of action against HRC for alleging that HRC was a retailer. The matter, HRC entered into a sort of a tentative settlement that was clear that HRC was going to continue its cross-complaint for indemnity against Dow. We all appeared for court on May 15, 1995, and when we appeared, we learned that Dow had filed bankruptcy that morning. As a result, the matter was stayed. HRC ultimately settled with Baker to avoid going to trial where it alone was in the sights for both the negligence cause of action and the strict liability cause of action. HRC was unable to get a finding of a good-faith settlement because of the bankruptcy stay. After the settlement, which is lengthy and it's included in the record, including lots of recitals, particularly including that there was no agreement as to how much of the settlement for $880,000 related to economic damages and how much related to non-economic damages. There was also no agreement as to how much related to which particular cause of action. The Dow Corning being in bankruptcy, the only way that we could approach them after our request that the stay be removed was to file a claim. HRC filed a claim, as did Baker, and the matter continued with charges against Dow for strict liability for manufacturing an allegedly defective product. The matter continued with discovery being permitted. While both matters, both claims were not consolidated for the purpose of discovery, they were treated that way. At one point in time, the bankruptcy judge in Michigan recused himself, and the matter went to the Eastern District Court in Detroit, and Judge Hood handled it, and then she transferred it with the consent of all the parties to the Central District Southern Division Judge Taylor. We continued with discovery. Dow filed a motion for partial summary judgment. Dow's motion said, HRC, how can you come after us requesting equitable indemnity? We understand that if you were in the stream of commerce, that you would be entitled to do this, but you're not because you weren't a retailer, because the law is clear that you can't, you couldn't have been a retailer. Well, Your Honor, our position, and the Court granted that, and after the Court granted it, we entered into a settlement that dealt with the remaining issues that related to economic damages, because what Dow had effectively done, and the Court in granting the motion, was to say that we could not be entitled to non-economic damages in our claim for indemnity. The Court, after the settlement of the economic portions, the Court entered its final ruling or judgment, saying Dow Corning Corporation does not have an indemnity obligation for non-economic damages to defendant hair replacement centers concerning the matter of Bruce Baker. So, Your Honor, we're here. That's when you come to this issue of whether your client provided a service for Mr. Baker or sold him a product. Yes. And, Your Honor, our position is that under the law, we're not, that's not an element of the cause of action that we have to prove. We don't have to go in on our claim for indemnity and prove that we're at fault in anything. We don't, and we cited several cases to that effect. Otherwise, there are all sorts of problems that can result. You haven't even proved you're at risk for a strict liability claim. Well, Your Honor, the, in the, we believe that the case law says that we're, it's enough that we were sued for it and that we, that we contested the issue, and it was hotly contested. So we actually think that it's enough that we were sued for it and we had to settle to get out from under it. Well, see, that, there's an assumption there. You had to settle to get out from under it. This wasn't the only claim you were facing. We were facing other claims, but if, if this claim didn't matter, Bruce Baker's attorney, Larry Rudd, would not have been so, so adversary in fighting our attempt to, to establish that we were not a retailer of the product. And in, in the opposing papers, we filed two motions for summary judgment. In the opposing papers, they came up with some, some theories that started raising issues. Number one is we, we sold a, a product that we serviced. The product originally, we actually sold three of them. They were hair, hair systems, and, and we called them systems. They included the, the hair piece that was measured and, and cut and, and dyed and fit. And they also included what we considered was a, a, a proprietary thing because we didn't disclose it. They included this Dow Corning 355 medical adhesive that turned out in the hair replacement industry to work very well. So we sold the original product. It was over $2,000. And the cost to maintain it, which was required if you wanted the warranty, the cost to maintain it was only two and a half percent of the purchase price. Mr. Baker bought three of them. In addition, while we did not announce that we would sell the, the adhesive because we took the position you can only get the adhesive here, we sold small bottles of what was called no tape that was, that was 355 medical, the adhesive that was bottled by a different company, but it was the Dow Corning product. We sold that. In fact, Mr. Baker bought it about two weeks before he bought a bottle. Also, Mr. Baker bought a third hair piece a couple of weeks before his injury. So there were, there were a number of issues that the clients were pursuing that said this is really, they really were. This is a part of a product that they, that they sold us. And so it, there, there were those issues. If, if it didn't matter to, to them, to Baker, then they would have said fine, we're going to let you out of it. But it did and they fought about it and we ended up with, with Dow Corning in bankruptcy with the stay and here we are, we're going to trial. We, we obviously, we were involved in putting it on and obviously there was a claim there for negligence. We, we took the position that, you know, there were only two people that were in that room, Mr. Baker and our stylist. And our stylist says that she didn't, she didn't cut him or nick him or pull anything. If she did, she would have felt terrible. She would have known about it. And she scrubbed his head with alcohol afterward and it would have stung. And so she didn't believe it. Well, there may have been something that happened. But what the case, the other side of the case, which was large, had to do with the product, the adhesive. The drying agent for the adhesive was Freon. And there had been prior cases of welts and, and rashes and other problems caused by the Freon. So it truly was a, a, a disputed negligence claim and a disputed strict liability claim. And there were experts on each side that demonstrated the way they felt very strongly that the product was defective. So we found ourself in a position where we're, they're gunning at us and we're, we're at risk for the potential of negligence. Yes. That we felt that, you know, we would, we do, we would do the best we could to, to defend that. We're also being gunned at for strict liability. And our, our position in our cross-complaint was just, you know, obviously something happened to this man. And we had learned some things that we thought related to the strict liability aspect. And we made the decision. We settled the case. Now, this is, it's, this is fair to, to Dow Corning. You know, we paid a claim of Dow Corning. Dow Corning would never be called upon to pay that twice.  If, if it turns out in this case Mr. Baker passed away and he dismissed his claim, but if it had continued on and if Dow had made its peace with us and we weren't involved, they would have, the first thing they would have done is said, hey, Hair Replacement Centers paid you $880,000 and we want a credit for this against our judgment. Dow Corning hasn't presented any cases that say that we're, we're not entitled to indemnity where we settled a suit against us. Absolutely none. We presented the three main cases. One of them has to do with the situation where Aetna bought cars for its employees. One of the employees got in a wreck. There was a lawsuit against Aetna. And Aetna said this accident was caused because it was a Ford product and it's a, it's a manufacturing defect. That was the cause of it. Aetna settled. Counsel, I have a, I have a question for you, please. Thank you, Judge Gould. Yeah, I have a question, if you don't mind. And you can address it at any point in your argument. But assuming, assuming that we concluded that the Hair Replacement Centers had some exposure for strict liability on this disputed claim and then they make this settlement, how would it be determined what part of the $800,000 related to the liability exposure that I'm assuming and what part related to settling the disputed assertion of negligence of your employees? That's a very interesting question. And in Judge Taylor's court, we had begun the work for that and we had presented papers. What we believe is that we would have proceeded to trial and the finder of fact would have made decisions. One with respect to whether or not HRC was negligent. One with respect to whether or not the product was defective. Then we believe that the trier fact would have been asked to determine what, what percentage of the cause of the injury to Baker was related to the defective product and what percentage to HRC's, if it was found negligence, negligence. Would you have lawyers who would testify as to opinions about exposures on each claim? What we envisioned was that we would present, instead of just proving up the settlement, that we would present evidence through depositions because Mr. Baker had passed on as to his claim and that the jury would make a decision based upon that, those and live, live experts and other witnesses. And the jury or it was going to be a jury trial. The jury would have made a decision and they would have found those issues just as if Dow Corning hadn't filed bankruptcy and if HRC had settled before trial was supposed to start in May, May 15th of 1995, the same thing would have occurred. HRC would have continued with its cross complaint. The jury would have made decisions as to what, whether there was negligence and strict liability, whether HRC was, was, or whether they were the, the approximate cause of the damages to Mr. Baker. They would have divided it. They would have made a decision as to what Baker's damages were and they would have decided how much of them were for, were for economic damages and how much for non-economic damages. And then it would be a matter of arithmetic and a mathematical calculation to determine to the extent that HRC, let's say HRC was 50 percent responsible for negligence. Well, it's a joint and several liability for the economic damages and I'm certain that the judge would have said, okay, Dow, you're responsible for 50 percent. If, if there was a strict liability finding and HRC are responsible for 50 percent of the economic damages, Dow, you've got to pay them back 50 percent or some, some proportion based on what the jury found, the total damages. With respect to the non-economic damages, if HRC was 50 percent responsible, we believe that the court would have said, you don't get for negligence, under Proposition 51, you do not get any indemnity for, for non-economic damages. You paid those in a settlement that they're yours for the part of the injury that was caused by your negligence. But with respect to the 50 percent, again in our illustration, that was caused by the strict liability, you're entitled to equitable indemnity because you are considered to be in the stream of commerce because you settled the case and you're not required to prove it in this case as an element. You settled the claim against Dow and so you're entitled to full indemnity for one half of that non-economic damages from Dow. And that's how we envision that it would have worked out in the end. Okay. Thank you. I guess I don't understand the allocation of, of responsibility across legal theories. I mean, basically it's saying, well, how much of this claim is negligence and how much of this claim is strict liability? Well, Your Honor, the reason is, is because the law is clear and I don't believe it's disputed by Dow that not only is, certainly it's clear that if you're in the stream of commerce, you're all fully responsible and generally the manufacturer owes full indemnity to, to the wholesaler and the retailer. So that law is clear. Proposition 15 wasn't designed at all to deal with that situation where the it was designed to deal with the situation where independent tortfeasors cause an injury. And so to the extent that the jury found that Mr. Baker's injury was caused by a, by strict liability or a defective product, we believe that it, that to that extent HRC should be reimbursed. But when is that kind of finding ever made? I mean, in an underlying trial, the jury would be asked on different theories and then ultimately if the plaintiff prevails on multiple theories, they'd select a remedy. I just am not familiar with the situation and I don't live and didn't practice in California, so maybe it's based here, but where somebody's asked to choose or allocate an injury across different legal theories. Well, Your Honor, the question that they would be asked would be simply, you know, taking the entire amount of the damages to be 100 percent. You know, what percent was caused by, you know, if you found the product to be defective, what percent was caused by the defective product. And if you found HRC to be negligent, what percent was found by, you know, against HRC, and the total has to be 100 percent. Your Honor, the cases that we reviewed when we were preparing and met with Judge Bragerson, we said, you know, the cases go so many different ways, you basically have to fashion, you know, how you're going to handle this, you know, in an equitable fashion. And what the judges, there are some cases that say that we can just establish the $880,000 that we paid and that's, you know, that it was a reasonable settlement and that's the amount. But they go on. I have another question for you, counsel. I'm sorry, I may be taking you over your time, but I hope Judge Bragerson will permit this. My question is, is it in theory, in legal theory, could Dow have strict liability as a manufacturer of a allegedly defective adhesive product, and could the hair replacement centers at the same time have a strict liability for selling a system of which the adhesive is one component? Yes, under California law. Like if Buick sells a Buick and they've got their brake, they use some adhesive in their brake system and the adhesive is made by someone else and it fails and the brakes don't work on the car, I'm assuming Buick selling the auto has a strict liability, and maybe the brake manufacturer, the adhesive company does, too. I just, I'm not sure how it works in this context. Well, Your Honor, it would be, you know, there certainly would be issues in that situation, particularly how the, how Buick and its manufacturer utilize that product. But it would, it was sold and manufactured by Buick and they would be strictly liable, as would be if the adhesive or whatever was used in the brake mechanism. I would suggest that they would also be strictly liable, and then there would be an issue as to who would owe whom, you know, equitable indemnity or some sort of comparative fault. Okay, so if that's true, then if your client sells a hair system and one of the parts of that system is adhesive, then is your client strictly liable or potentially strictly liable, as well as the adhesive maker? And I realize below, you know, you would have contested strict liability, but is that, you did settle the claim, right? Yes, Your Honor, the, what was alleged, and yes, there could be issues such as that, but what was alleged by Mr. Baker was that there was strict liability and as related to HRC, it was as a retailer, and that was their specific allegation. I see. Not for selling a hair system, no. Well, it was, what they treated is that we were a retailer because we retailed the adhesive product in our system. You retailed the adhesive as part of your program. Yes. Okay. All right. Thank you. All right. Thank you. May I continue for a minute? Yes, Your Honor. All right. Okay. You know, there's a couple of things. One thing is, is that the law that we've cited, and there were other cases that we didn't go through, but we do it in our briefs. It's fair to Dow. Dow can get a credit. Dow, we're paying Dow's debt. They're not complaining that what we're asking is unfair, because in the end, there would have to be a determination that their product was defective, and Dow, if we did something wrong with the product, that would all come out, and it would be fair in the end. The other is, it's fair to Baker. Baker controls what the claim is against us. If Baker wanted to do away with the strict liability claim, not only would they not have had to contest it, and we could have prevailed on a motion for summary adjudication, but what could have happened is they could have just dismissed it with prejudice, and then we're no longer ever going to be hit with that claim, and we could have settled the case. If that happened, we would only be here dealing with the we wouldn't be here. But if that happened, our only exposure would have been for negligence, and under Proposition 51, we're not going to get non-economic damage indemnity from Dow if we pursued it and we resolved the economic damages part. So that's not fair. The other thing that's really, to me, is really big. Proposition 51 wasn't designed to interfere with anything like this. It had to do with deep pockets, and it's very clearly set out in the statute. It dealt with a situation where somebody is or the State maybe is 5 percent responsible for some, you know, the road, maintaining the road, and a drunk driver is for 95 percent, but the drunk driver has no insurance, and so the State has to pay everything. And that's what it arose out of. In this case, it has nothing to do with that. It has to do with we paid something that was Dow's responsibility, or that's what our claim is, and if it's determined to be Dow's responsibility, we should be reimbursed. They shouldn't get to walk away and say, oh, we get a credit, you know, and they paid some money and we don't have to pay them. They should pay us what the credit would be if they got a judgment against them, and that's what we're looking for. The other thing is that in the cases that were cited, one of the major things was the public policy promoting settlement. And how can, you know, how can the benefit and purposes of settlement be furthered if when people settle, they don't know what they're settling? And it should be that they're settling what they're being sued for and what the lawsuit and the argument is. And the cases say that when we go to seek indemnity, we don't have to have as an element of our claim that we have to prove that we were liable. And what happened by the partial motion for summary judgment, we were put in a position that Dow said, oh, you don't get indemnity unless you can be strictly liable as a retailer. So now you need to present evidence that you're strictly liable as a retailer. Well, we probably have a judicial admissions through our motions for summary adjudication that we weren't a retailer, but that wasn't the issue. The issue was that we were stuck in State court with a very aggressive plaintiff and plaintiff's attorney that were coming up with numerous theories as to why we were a retailer, and we settled the entire claim. And we believe that that's the – that is essential to promoting the settlability and settlements in these cases. May I reserve any remaining time for one more? Well, you're in deficit territory. Thank you, Your Honor. Good morning. Good morning. I would like to introduce to the Court my colleagues, my partners who were actively participating in this case, Howard Soloway and Ben Fox. The issue presented here is really very clear-cut. The district court correctly decided to grant summary judgment because under applicable control in California law, there was no possibility of the appellants obtaining any indemnity claim for Baker's non-economic damages. There's no question whatever that in order to sustain a claim for indemnity, the person seeking that must establish joint liability of the third party to the third party. There is no basis whatever in California law to make that assertion against Dow Corning. In the first instance, Dow Corning has never argued that HRC must prove that it was its own liability. To the contrary, we explained that they have to establish that there was a potential joint liability because there could be no claim for indemnity if it were not. And the record shows unquestionably under California law that no potential for joint liability ever existed. First, let's talk about strict liability. There was the slightest possibility of Baker's ever been able to maintain a strict liability claim against HRC. HRC was primarily engaged in providing services. It could no more be liable strictly to Baker on such a claim than a surgeon could who had been sued for strict liability because he used a defective needle. The service was not. Well, when HRC tried to get summary adjudication. Yes. They did make the effort, and that effort was not successful. Well, it was not because the Court said it was premature. It's difficult for me to understand why it was premature, but that's what the Court decided. The Court never came to grips with what that issue was. It wasn't as if the summary judgment should have been granted. It should have been granted because there was no basis of liability whatsoever to the plaintiff Baker by HRC on a claim that it was vending some kind of retail products. It wasn't. The problem that HRC had, though, is that the judge said denied, and then they're facing at least theoretically the possibility of exposure, and they go to settle the case, as most cases are settled, and why aren't they right in saying, look, that's at least some component part of the settlement because the claim's still out there facing us? Well, I can make the argument, but of course, under California law, they wouldn't get any place with it. Of course, they would. You made the argument, and they didn't get any place with their motion for summary  But they didn't simply because the Court decided it was premature. That never reaches the merits at all. The Court never reached the merits. The Court, I think, should have done so, but it didn't. But the fact is that under controlling California law, there is no way that particular plaintiff could have maintained an action for strict liability because the California law is settled, that there is no question of having any strict liability when what is involved is primarily public services, and that doesn't matter whether you're a druggist or whether you're a medical doctor or who you are. There's just no liability on strict liability. And the other theory was the claim against HRC was negligence. But the law in California could not be clearer that there is no liability for comparative negligence left in California since California enacted Civil Code 1431.2, which says that there's no joint liability. It's several only, not joint. Therefore, if there was ever a case in which Baker could have prevailed on negligence, it could not have been joint liability with Dow Corning. The result which was reached by the district court was entirely correct on what is settled California law. It was required to apply California law, and it did, and it reached precisely the right conclusion. There simply isn't anything left of any opportunity for HRC to claim indemnity because there was never any basis for any joint liability to be asserted. It doesn't change a bit that the district court thought that the original claim was premature. It wasn't premature, but even if he thought so, that doesn't resolve the issue. The issue still is, under what circumstances of California law could HRC ever maintain a cause of action for or against Dow Corning on the theory of strict liability? And the answer is they couldn't because Baker could not maintain an action on strict liability against the provision of the two pay services. So it's the same. Judge Ostendler, let me address that with you. I hope it's okay to mention that years ago I was a law clerk for Judge McCree, and during an argument in a case he had a former Sixth Circuit judge before him and thought it was appropriate to refer to him as judge, so I hope that is okay. My question is this. It seems to me that the negligence issue is pretty well covered by the California law, but I'm having trouble seeing why as long as the strict liability issue was still in the case, the issue would become whether the HRC acted in good faith in making their settlement based on a still existing exposure as to whether they might have any conceivable liability. Why isn't that the issue as to whether they acted in and made a good faith settlement of what they thought was an exposure as opposed to looking at it, how we would decide on the merits of that claim? The HRC can make a settlement on any ground of suspicion it might have had to protect itself from ultimate liability, but that does not mean that there is a joint liability with Dow Corning for whatever settlement the plaintiff chose to make, the appellant chose to make here. They can settle it because they just are worried, might have been worried initially about the fraud claim, and certainly there's good reason to be worried about the negligence claim, but that's not because Dow Corning was responsible in any way for the negligence of the operator of that particular toupee exercise. All right. Well, I agree as to those claims, but could a jury have found that in part HRC was retailing the adhesive made by Dow? Well, that issue would never have properly gone to a jury because the California law is very, very clear that under such circumstances, there's no liability whatever strict liability because any kind of sale that was made during the course of it, which, of course, was forbidden by Dow Corning itself, but there's no basis to make any such The California law, which would have to be applied as a matter of law, says there's no such strict liability. It isn't that the Dow, that DCC, HRC has to prove here that they're, that our client argued that they had to come up with something. They didn't. But there's no basis whatever to find that there was some basis to go to the jury on that count because California law flatly says no. So that would be the end of it, would be a decision for the trial court, not for a jury. That's a question of law. Thank you. You're welcome. Does the Court have any other questions the Court wishes to ask? I will save, if anywhere, any time I take it, but I think that the Court has well in granting summary judgment because it's 100 percent consistent with California law and inconsistent with the arguments that the appellant makes. Thank you. Thank you. All right. Your Honor, I have nothing further unless there are questions. Any questions? I have a question whether the parties have, not that they would have to, but whether the parties have availed themselves of the Ninth Circuit's mediation service and if there's any interest of the parties in, if they haven't, in doing that before we decide the case. Your Honor, we were approached in a phone call, in a conference call with respect to that issue, and counsel for both sides were involved in. The decision was made that, to go forward with the appeal and the arguments. Okay. Thank you. All right. Thank you. I agree that the effort was forwarded by the Court, but this is a case in which there's only a question of law involved, in which we could not believe that the Court mediators, though they're very, very good, were going to be able to resolve the issue in California law. Therefore, we believe the statute goes before this Court. Very well. Thank you. We appreciate the argument on both sides, and the case was very well argued. And we'll now come to our next matter.
judges: Pregerson, Gould, Clifton